# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| RAMBO ASSOCIATES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SOUTH TAMA COUNTY COMMUNITY SCHOOL DISTRICT, <br><br> Defendant. | No. C04-0118 <br><br> **ORDER** |

This matter comes before the court pursuant to the defendant's October 13, 2005, motion for summary judgment (docket number 18). The parties in this matter have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The defendant's motion for summary judgment is denied.

The defendant moves for summary judgment contending that the written contract for architectural services signed in 1996 did not bind the South Tama Community School District to pay for services rendered by the plaintiff after 1998 absent specific authorization from the District. The defendant further contends that the plaintiff cannot rely on theories of unjust enrichment and promissory estoppel as there is an express agreement covering the subject matter of the plaintiff's claim.

<u>Statement Of Material Facts Not In Dispute</u>

On May 20, 1996, the South Tama County Community School District signed and approved a contract with the plaintiff Rambo Associates, Inc. The dispute in this case centers around the services that were contemplated by that contract, the time period established for the agreement, and the manner in which additional services were to be approved and compensated.

The contract consists of a one-page "Standard Agreement Between Owner and Educational Facilities Consultant," "Attachment A," and "Attachment B." The description of services to be rendered is described in the Standard Agreement at ¶ 4, Attachment A at I-IV and in Attachment B at Article 2. It is exceedingly difficult to determine from these three provisions what scope of work was contemplated. The bill for work conducted between 1996 and 1998, with expenses, was less than $10,000. This bill was paid by the defendant.

Authorization for work performed following the initial phase of the project is discussed at several places throughout the documents. In the Standard Agreement at paragraph 1, the following is stated:

> The Consultant, at the request of the Owner, shall continue to provide services through further planning and implementation phases of facilities projects (or variations thereof) addressed in initial consultation phases and subsequently selected by the District for further development and/or funding.

That agreement further provides in paragraph 3:

> Fees for and authorizations to proceed with professional services shall be established and approved by the Owner for each phase or specific scope of services to be jointly addressed by the Owner/District and Educational Facilities Consultant. For projects addressee in Master Planning that the Owner selects for further development within three years thereafter, the Consultant shall credit applicable fees from preceeding [sic] applicable work to his subsequent design phases.

Further, in paragraph 4 it states as follows:

> Consultant's services shall, at the request of the Owner, specifically extend curriculum-based Master Planning completely through the funding of Bond Issue period, Educational Programming, Schematic Design and Design Development Phases, and Project Management and Cost Management Systems utilized. . . . Subsequent phases may be authorized by the Owner for addressed projects or related portions or variations thereof or subject to the terms of the Attachment unless otherwise mutually agreed in writing.

Attachment A concludes with the following second to the last paragraph:

> The fee amount noted for Phase One services as a retainer for the Consultant's work as outlined through presentation of the study to the Board. Should the District elect to move forward with the funding/implementation process for projects based upon the education programming, conceptual schematic or other portions of the Consultant's work as generally addressed with the study, the Consultant may provide further services.

Finally, Attachment B appears to contemplated that the initial phase would be completed ordinarily within two years. It says the following at paragraph 11.5.1:

> IF THE BASIC SERVICES covered by this Agreement have not been completed within Twenty-four (24) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Subparagraphs 10.3.3 and 11.3.2.

Paragraph 11.3.2 provides as follows:

> Any Additional Services for which this clause applies must be authorized by the Owner. If the Owner directs the Architect to perform Additional Services and an hourly basis of compensation is applicable, . . .

ARTICLE 12 of Attachment B states that the fees applicable to work performed prior to funding of the project shall be $2,500 and shall be fully credited towards basic services outlined in the agreement upon passage of the funding. It then states as follows:

> Should successive attempts be required for passage of a Bond Issue, the Architect's employment shall be continued with compensation and all other provisions above remaining in effect.

Analysis

The plaintiff contends that the contract governed the relationship as long as the defendant attempted to build any project contemplated by plaintiff's initial study. The defendant contends that the plaintiff was hired for an initial planning phase only and after that the plaintiff had nothing more than the hope of securing future business.

The primary issue to be resolved is the extent to which, and the manner in which the parties contemplated that the school district would be bound to pay for work beyond the initial consulting phase. When referring to engagement of the plaintiff for future work on the project, the contract has language such as, "at the request of the Owner," "subsequent phases may be authorized by the Owner," and "authorized by the Owner." The defendant is correct when it argues that a school district can only act through a school board. However, that argument begs the question as to what was authorized by this contract. For example, a school district could approve a five-year contract for trash removal and the school board would not have to meet every time a school needed an extra truck to come out.

The court finds this contract to be ambiguous both in terms of the scope of work initially authorized and the manner in which future work was to be secured. The provisions of the contract relating to work beyond the initial planning phase were specifically negotiated by the parties. An April 18, 1996, letter from Clarence S. Lippert, the Superintendent of Schools, addressed to Angelo Passarelli of Rambo Associates, Inc. is telling. In that letter, Superintendent Lippert stated the following:

> 2. Attachment A, paragraph 4, appears to trigger automatic continuance into subsequent phases. We'd like this to be a separate decision. I'd suggest we strike out some words and adding [sic] others (in bold) as follows:
>> Subsequent phases ~~are~~ **may be** authorized by the Owner ~~by commencement of funding development~~ for addressed projects or related portions or variations thereof or subject to the terms of the Attachments unless otherwise mutually agreed in writing."
>
> . . .
>
> 6. Page 9, Article 11, Items 11.5.1 places a time limit of 24 months for completion of a construction project without paying extra for architectural services. Depending on the project, this might not be sufficient time, and ought to be reviewed prior to entering into a specific project.
>
> . . .

4

> 8. Page 10, Article 12, Item 12.2.2 specifies $2,500 (potentially credited toward basic services) for work performed prior to funding. The last sentence states, "Should successive attempts be required for passage of a Bond issue, the Architect's employment shall be continued with compensation and all other provisions above remaining in effect." We assume that the initial help in passage on a bond issue would be performed only at the request of the District, and that paid help on subsequent attempts would follow only after specific request from the District each time. Perhaps this ought to be specified in the agreement to avoid misunderstanding.

In response, Mr. Passarelli sent a two-paragraph letter to Dr. Lippert on April 29, 1996, revising the agreement and attachments to reflect Dr. Lippert's comments. These comments strongly suggest that the school district did not want to be bound to any obligation beyond the initial planning stage. However, the clause identified in ¶ 8 above remained without change in the final contract.

The court does not find, as a matter of law, that this contract expired in 24 months. Paragraph 11.5.1 says that if the work to be done exceeds 24 months in duration at no fault of the plaintiff, "extension of the Architect's services beyond that time <u>shall be compensated</u> as provided in Subparagraphs 10.3.3 and 11.3.2." (emphasis added). A compensation formula appears in ¶ 11.3.2 after it says that any additional services must be authorized by the Owner. Again, the manner in which the authorization is to be provided is a dispute for trial.

The issues concerning the plaintiff's claims for equitable relief will be resolved at trial as well.

<u>Witness Len Snyder</u>

At the Final Pretrial Conference, plaintiff advised the court that it wished to call Mr. Snyder as a witness, acknowledging that Mr. Snyder had not been disclosed to the defendant as a potential witness until two days before the Final Pretrial Conference. According to the plaintiff, it just realized that Mr. Snyder was present at a 1995 meeting with (then) superintendent Dr. Lippert, and wanted Mr. Snyder to testify as to

5

representations and possible admissions made during negotiations and meetings. Defendant resists the untimely disclosure of Mr. Snyder and moved to have him stricken as a witness at trial. Defendant argues that Mr. Snyder was a former employee of the plaintiff, thereby rendering specious any argument that the plaintiff just realized his status as a person with knowledge. Plaintiff advised that it would be willing to make Mr. Snyder available to the defendant for a deposition in the week remaining before trial is to commence.

Defendant's motion to preclude Mr. Snyder from testifying at trial is granted. Plaintiff has not demonstrated good cause for its late disclosure. Moreover, the court finds that the defendant would be prejudiced by having Mr. Snyder testify at trial in that defendant would be forced to use precious trial preparation time to depose Mr. Snyder. Finally, the court thinks that Mr. Snyder's testimony would largely be cumulative of evidence that the plaintiff can and will offer through other witnesses and documents.

Upon the foregoing,

IT IS ORDERED

1. Defendant's October 13, 2005, motion for summary judgment (docket number 18) is denied.

2. Trial to the court will commence <u>WEDNESDAY</u>, January 18, 2006, at 8:30 a.m., second floor courtroom, United States District Courthouse, Cedar Rapids, Iowa.

3. Defendant's oral motion to strike witness Snyder as a trial witness is granted. January 9, 2006.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT