# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| RAMBO ASSOCIATES, INC., | |
| Plaintiff, | No. C04-0118 |
| vs. | **ORDER** |
| SOUTH TAMA COUNTY COMMUNITY SCHOOL DISTRICT, | |
| Defendant. | |

_____

This matter comes before the court pursuant to trial on the merits conducted from January 18 through 21, 2006. The parties consented to the exercise of jurisdiction by a United States Judge pursuant to 28 U.S.C. § 636(c). The court finds in favor of plaintiff and directs the Clerk of Court to enter judgment in the plaintiff's favor for $2,500.00, plus costs.

## NATURE OF THE PROCEEDING

This is a breach of contract action brought by an educational facilities consultant/architect against a school district. Rambo Associates (hereinafter Rambo) and the South Tama County Community School District (hereinafter South Tama or the District) signed a contract for services in preparation for the planning, funding, and building of a new school. South Tama contends that the contract was only for a preliminary study and assistance in passing a bond referendum. Rambo contends that the contract obligated South Tama to use its services as an architect for any project contemplated by its initial study or pay the reasonable value of all services rendered. The court denied the defendant's motion for summary judgment on January 9, 2006. The court

1

found that there was an ambiguity in the contract as to the scope of work initially authorized and how requests for additional services were to be authorized. The court makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

### The Parties

Rambo is an Omaha based educational facilities consultant and architect. In preparation for the building of a school, Rambo offers services exceeding that of a traditional architect. While architects routinely assist in the development of the planning process for any business's building projects, 30-40% of Rambo's employees are former educators and school administrators. Rambo also has tremendous experience with the funding for public school projects and in the public relations necessary to be successful in a local school bond election. The President of Rambo Associates is Merle Rambo.

South Tama is a school district in Eastern Iowa with facilities at Tama, Chelsea, and Toledo, Iowa. Sixteen hundred students attend four school facilities in South Tama. Its superintendent from the earliest time relevant to these proceedings until July 2002 was Dr. Clarence Lippert. Dr. Lippert was succeeded by Superintendent Larry Molacek.

### Events Leading Up to the Contract

In 1995, the school district was considering building a new school. It had several older buildings and no new construction since 1968. On November 20, 1995, Dr. Lippert informed the school board members that he had contacted architectural firms at the Iowa Association of School Boards convention. Dr. Lippert had asked these firms to express interest in conducting a comprehensive study to determine what would be necessary to put existing buildings in condition to provide quality education for the next 30-50 years. In a memorandum to the Board, he stated:

> I warned each [architect] that the firm that did this study would likely not be considered eligible to provide the detailed specifications for any future construction or renovation projects.

(Exhibit T, at 1). Rambo was the first firm identified as having been contacted at that convention.

On March 25, 1996, Angelo Passarelli of Rambo Associates sent Dr. Lippert a letter and enclosed a proposed contract for his review. (Defendant's Exhibit K). The letter requested that Dr. Lippert review the agreement and its Attachment "A." Mr. Passarelli indicated that he would later send Attachment "B." Dr. Lippert's response expressed disappointment. The first thing Dr. Lippert said in response was that the contract implied that Rambo had been hired well past the initial study phase, on through the construction phase. He then stated,

> Beginning with my initial contact last August, I made it clear that we were seeking consultation only through the facilities study stage (just as you outlined in your presentation of February 29, 1996).

(Exhibit B). The last paragraph of that letter made it clear that Dr. Lippert would not recommend that the Board of Education sign the agreement.

Dr. Lippert also expressed his disappointment with the first proposed contract in a memorandum to the School Board members dated March 27, 1996. In this memo he stated:

> I find the contract document VERY unsatisfactory for many reasons, including the following:
> 1. The document appears to commit the owner/district to continue using Rambo & Associates for all phases through construction. We made it clear from our first contact that we intended that the initial study phase was all we intended.

(Exhibit M).

The agreement was revised by Mr. Passarelli and presented to the Board of Education. In a letter dated April 18, 1996, Dr. Lippert thanked Mr. Passarelli for the revisions but, again, made it clear that the school district did not want to be obligated to continue with Rambo beyond the initial study phase. See, e.g., Exhibit Q at 1 ("Attachment A, paragraph 4, appears to trigger automatic continuance into subsequent

3

phases. We'd like this to be a separate decision. . . .); Exhibit Q at 2 ("Although my understanding is that Attachment B would not apply to this stage, I will offer the following observation should they become relevant to future agreements. . . . It is our preference that when, and if, we get to [the construction] phase a lump sum should be determined [for the architect's fees].").

When describing § 12.2.2 of the Agreement concerning assistance with the passage of a bond issue, Dr. Lippert noted that, again, the contract appeared to call for automatic renewal of the architect's employment. He responded to this paragraph as follows:

> We assume that the initial help in passage on a bond issue would be performed only at the request of the District, and that paid help on subsequent attempts would follow only after specific request from the District each time.

(Exhibit Q, at 3).

Rambo contends that during the negotiation process, the District had a change of heart and a desire to enter into a more flexible arrangement with Rambo. Other than the eventual signing of the contract, the documents associated with this case do not support this contention.[1]

### Contract Terms

The final version of the contract accommodated Dr. Lippert's concerns by including the following language:

> The Consultant, <u>at the request of the Owner</u>, shall continue to provide services through further planning and implementation phases of facilities projects (or variations thereof) addressed in initial consultation phases and subsequently selected by the District for further development and/or funding.

(Exhibit 1, at 1, ¶ 1) (emphasis added).

---

[1] Mr. Rambo was obviously somewhat hamstrung at trial by not having Mr. Passarelli present to testify. Mr. Rambo and Mr. Passarelli had a serious business falling out followed by years of litigation.

> Consultant services shall, <u>at the request of the Owner</u>, specifically extend curriculum-based Master Planning completely through the funding or Bond Issue period, Educational Programming, Schematic Design and Design Development Phases, and Project Management and Cost Management Systems utilized. . . . Subsequent phases may be authorized by the Owner for addressed projects. . . .

(Exhibit 1, at 1, ¶ 4) (emphasis added).

The issue of fees is addressed in several places throughout the contract. Beginning with the most general expression, the contract provides:

> Fees for and authorizations to proceed with professional services shall be established and approved by the Owner for each phase or specific scope of services to be jointly addressed by the Owner/District and Educational Facilities Consultant.

(Exhibit 1, at 1, ¶ 3). The contract further provides:

> For services to be completed by the Educational Facilities Consultant, fees shall be negotiated on a lump sum or other basis appropriate to each project, with total compensation not to exceed that outlined in the standard fee schedule included with Attachment B for services addressed therein.

(Exhibit 1, at 1, ¶ 4). Attachment A to the contract sets forth the fees to be paid for the study that had been requested by the District:

> Fees for services in Phase One work shall not exceed Five Thousand Nine Hundred dollars for facilities review outlined in I. through VII. above. Standard reimbursable expenses, not to exceed Four Thousand dollars, shall also be paid, including an allowance for provision of graphic and miscellaneous descriptive materials for communications purposes during Phase One.
>
> The fee amount noted for Phase One serves as a retainer for the Consultant's work as outlined through presentation of the study to the Board.

(Exhibit 1, Attachment A, at 2).

The contract also addressed the fees to be paid for assistance in passing a bond issue. Article XII of Attachment B of the contract states:

> 12.2.2 Fees applicable to this work performed prior to funding shall be Two Thousand Five Hundred Dollars ($2,500.00), and shall be fully credited toward Basic Services outlined in this Agreement upon passage of the funding.

The continuation of the contract beyond Phase One described in Attachment A is addressed in several other places within the contract. Specifically, Attachment A provides:

> Should the District elect to move forward with the funding/implementation process for projects based upon the educational programming, conceptual schematic or other portions of the Consultant's work as generally addressed within the study, the Consultant may provide further services. . . This shall not impact the District's options to postpone, abandon, or terminate various project options addressed in the study, or the services of the Consultant in accordance with this agreement and its attachments.

(Exhibit 1, Attachment A, at 2.) With respect to subsequent help on bond issues, the contract states:

> Should successive attempts be required for passage of a Bond Issue, the Architect's employment shall be continued with compensation and all other provisions above remaining in effect.

(Exhibit 1, Attachment B, Article XII, § 12.2.2).

## Contract Ambiguity

The contract is ambiguous as to the scope of work authorized. It certainly speaks to the possibility that additional projects might be requested or selected by the District following the Phase One study that was clearly expressed in the contract. At Attachment B, the contract states that if basic services covered by the agreement have not been completed within 24 months, through no fault of the architect, extension of the architect's services beyond that time shall be compensated pursuant to § 11.3.2 of the contract. When the District was unsuccessful in its bond issue election in March 1999, the parties acted as

though the contract had been fulfilled. Rambo was paid the fee negotiated and no further compensation was sought. Any communication between the school district and Rambo was extremely limited for the next three years. By 2002, the District could even not find its copy of the contract. However, when describing Rambo's work to assist in the passage of a bond issue, § 12.2.2 of Attachment B provides:

> Should successive attempts be required for passage of a Bond Issue, the Architect's employment shall be continued with compensation and all other provisions above remaining in effect.

This provision suggests that the architect's engagement continues into perpetuity. This would be more problematic but for the clear expression in § 12.2.1 that Rambo's compensation for such efforts shall be $2,500.00.

## Resolution of Contract Ambiguity

Even a cursory reading of Attachment A to the contract prompts the immediate reaction that Rambo agreed to do a tremendous amount of work for $5,900. The seven areas addressed in the study are broadly stated. The court has no way to determine how much of this work is simply and quickly done by a consultant with Mr. Rambo's expertise. However, the defendant's expert architect, William Dikis, estimated the study done by Rambo to be the product of 200 to 400 hours of labor. Mr. Rambo's firm did not maintain any time records for this work. Instead, it was banking on a later lump sum contract when the bond issue passed.

Mr. Dikis credibly explained that architects frequently provide initial services at or under cost in order to subsequently secure the more lucrative architectural work after passage of a bond issue. School districts such as South Tama have very tight budgets and do not often possess the discretionary monies necessary to fund an elaborate study. However, passage of a bond issue with an appropriate funding mechanism will ultimately produce sufficient funds to compensate the architect for its work throughout all phases of employment. This provides a reasonable explanation as to why Rambo did not maintain time records. First, the school district insisted on negotiating fees on a lump sum basis.

7

Second, if the bond issue did not pass, there could be no further compensation for Rambo. If the bond issue passed, fees would again be negotiated on a lump sum basis for which time records would not be required.

Throughout the course of the parties' relationship between 1996 and 1999, and again between 2002 and 2004, there is no documentation concerning either party's concern for the fact that Rambo may have exceeded the scope of work contemplated by Phase One of the project. No one at Rambo ever said that Phase One was complete or that services being requested by the Board fell outside of Phase One. Similarly, there is no documentation to suggest that the school district ever asked about whether its requests for additional information would be billed to them at some point.

No one wants to work without compensation and Mr. Rambo certainly did not intend to do so. His experience with scores of other school districts and his impressive success in assisting successful bond issue elections gave him the confidence that he could get a bond issue passed in South Tama and that he would be the architect for the new school. Dr. Lippert further confirmed this kind of arrangement from his prior experience. As Dr. Lippert testified, school districts become particularly grateful to those professionals who assist them with successful bond issue campaigns. Subsequent employment of those professionals tends to be routine.

Rambo performed the phase one study as requested by the district. The district asked for many items of additional information and it appeared that each and every one of them was supplied by Rambo. Rambo also greatly assisted in efforts to pass a bond issue.

## School Bond Issues

It takes a sixty percent majority of voters to pass a school bond issue. The mechanism for funding the payment of the bonds requires a separate vote. There were two primary funding mechanisms discussed at trial. First is the physical plant and equipment levy (PPEL). There are two forms of the PPEL levy. There is a $.33 per $1,000 assessed property tax levy that a school district is entitled to receive by vote of the Board. Voters can pass an additional levy of as much as $1.34 per $1,000 of assessed property valuation

by a simple majority of voters. Alternatively, PPEL funds can be raised by a state income tax surcharge. However, PPEL funds cannot be used for interest on bonds, they may only be used to retire principle.

Beginning in 1998, school districts in Iowa had the option to fund a bond issue by using a local option sales tax. The school infrastructure local option (SILO) is an attractive way to finance school bond issues especially where property tax increases are difficult to get approved by voters or where the school district sits in a significant retail center. One of Mr. Rambo's areas of expertise lies in his knowledge of and creative blending of finance options.

On March 23, 1999, South Tama went to the voters with a bond issue. That bond issue failed by a significant margin as the school district received only approximately 36% of the vote. The PPEL issue also failed by a significant margin. Rambo had been paid the $5,900 fee/retainer plus its expenses by a June 1998 check in the amount of $9,875.88. (Exhibit EEE). Of course, Rambo worked beyond that time, up to and including the failed bond issue and PPEL election. Rambo acknowledged this payment in response to defendant's Interrogatory No. 13 which states:

> Please state whether plaintiff (or any affiliated entity) has received any payment from defendant from 1996 to present has received any payment from defendant from 1996 to present, and if so, please state:
> a. The amount of all such payment(s); and
> b. When the payment was received by plaintiff (or its affiliated entity).
> Answer: Defendant has indicated that it has paid Plaintiff a total of $9,875.88. Plaintiff is not aware of any basis to dispute this assertion. <u>This $9,875.88, however, represents payment for work done and expenses incurred in the prior years of project studies, and not payment for outstanding expenses incurred and efforts undertaken with respect to the renewed work performed pursuant to Sup't Molacek's authorizations.</u>

( Exhibit J) (emphasis added).

Dr. Lippert retired in July 2002. He was replaced by Larry Molacek, another impressive administrator. There was renewed interest in the attempt to pass a bond issue and funding. Mr. Molacek was well acquainted with David Thomas at Rambo as Thomas was a former school superintendent in the same Area Education Association as Molacek. These two had significant discussions concerning Rambo's role in the renewed bond issue campaign. Molacek asked Thomas about Rambo's compensation. Thomas assured Molacek that Rambo would look to the proceeds of a successful bond issue and funding campaign for compensation.

The effort to pass this bond issue was considerably more sophisticated than in 1999. Specifically, Rambo employee Kelli O'Brien provided detailed information, strategic planning and monitoring of objectives throughout the bond campaign. The school district had fewer people helping to pass the bond issue but more sophisticated help from Rambo. Unfortunately, on March 30, 2004, the bond issue again failed. It was devastating to those who had worked on the campaign as the measure failed by just a few votes. The PPEL measure passed, however. Accordingly, the school district was left in the unusual position of having a funding mechanism for payment of bonds but no ability to issue bonds. Ultimately, the voters understood this irony and, on October 5, 2004, passed a bond issue. The school district is currently halfway through construction on a pre-kindergarten through 5th grade school building.

Attempts at Reconciliation

Following the second failed bond issue in March 2004, there were hurt feelings. School board member Don Wacha was particularly adamant that the school district no longer associate with Rambo. Molacek could not even find a copy of the 1996 agreement between the school district and Rambo. (Plaintiff's Exhibit 117). By June 2004, however, James Dyck of the architectural partnership had been contacted for possible employment by the school district. Molacek had met Mr. Dyck at a Washington, D.C., National Association of School Board Facilities architectural jury. Molacek and Dyck were evaluating school designs for architectural awards. Kelli O'Brien of Rambo was busy

10

working for the passage of the October bond issue. (Plaintiff's Exhibit 124). By July 1, 2004, a motion had been carried at the school district to select the firm of R.L. Fauss as the construction manager for the facilities project. (Exhibit VV; Exhibit 128).

On July 8, 2004, the board approved a motion to negotiate a contract with James Dyck's Architectural Partnership for its services. (Exhibit WW). This was affirmed again on July 27, 2004. (Exhibit YY). The contracts with those entities were ultimately approved on November 22, 2004. (Exhibit BBB).

In early July 2004, Dave Thomas of Rambo attempted to resurrect the relationship with South Tama. He wrote letters on July 8, 2004, and July 9, 2004, requesting to meet with the school board to discuss these matters. (Exhibits 131 and 132). These requests were denied on July 12, 2004. (Exhibit 134). A meeting was then set up at the Ahlers & Cooney law firm in Des Moines pursuant to Mr. Rambo's claim that the 1996 contract was in effect and called for the payment of $80,000 in consulting fees. (Exhibit 133).

## Termination of the Contract

The contract says little about what would happen if Rambo's services were terminated. Article VIII discusses termination of the contract and states that Rambo is entitled to 20% of the total compensation earned to date as a termination expense. However, addressing the issue of termination begs the original question as to what was initially authorized and how the parties were to agree on the scope of additional services. Other than termination expenses, the contract does not speak to a formula for compensating the plaintiff's work beyond Phase One in the event of a termination.

The answer again lies in the fact that the parties were operating under something analogous to a lawyer's contingent fee agreement. That is, Rambo was banking on successful elections and subsequent negotiation of its fee from those revenues. The contingency did not materialize during Rambo's association with the school district. In some respects, the result seems harsh. However, the fact remains that the school district was not successful in accomplishing the bond issue and funding while associated with Rambo. While the contract between Rambo and the school district was negotiated, it was

11

clearly Rambo who was the drafter of the agreement and not just the "typist" as suggested by Rambo at trial. It had the ability to protect itself from what happened here. However, it is clear that Dr. Lippert would not have agreed to any provision that obligated the District to the additional payment now requested by Rambo.

## Damages

In preparation for the March 2004 bond issue, Rambo provided information suggesting that a $9 million bond issue could successfully support the construction of the new pre-kindergarten to 5th grade elementary school. (Exhibit 87). That document showed how $8,995,000 could support the project including an approximately $77 per square foot allowance for construction. Mr. Rambo has considerable experience designing school buildings that can be built at that cost. The document also reflected Rambo's proposal that it receive $599,000 for its basic services and an additional $53,000 for master planning relating to the possible future expansion of the elementary school to accommodate a middle school addition. However, only the pre-kindergarten through 5th grade elementary school was submitted to the voters.

The $599,000 proposed fee for Rambo was only a proposal. It was part of a pro forma document that showed that $9 Million could build a pre-kindergarten through 5th grade school. That fee was never negotiated nor approved by the school board. Paragraph 3 of Exhibit 1 specifically required that fees for and authorizations to proceed with professional services shall be established and approved by the owner for each phase or specific scope of services to be jointly addressed by the district and the consultant. Rambo's proposal in Exhibit 87 was not a negotiated fee contract.

The $599,000 "fee" then serves as the benchmark for the plaintiff's damage calculation in this case. (Exhibit 137). The plaintiff contends that 10% of that $599,000 fee should be apportioned to phase one (the initial study) pursuant to § 11.2.2 of Attachment B to the Contract. Because Rambo claims that it was 97% done with the study, it should receive an additional $58,103 for that work. The problem is that in Attachment A to the Contract, Rambo had specifically agreed to accept $5,900 for this

12

work. After it acknowledged receipt of those funds (Interrogatory 13), Rambo claimed that it was still entitled to fees for work done at Superintendent Molacek's direction. The phase one study was complete long before Molacek commenced his employment in July 2002. The request for fees for the high school classroom addition and the middle school addition must be pursuant to one of plaintiff's equitable theories because these projects from the initial study have never been selected by the district or submitted to the voters for any form of funding. Mr. Rambo simply states that PPEL funds could be used for these purposes without additional elections.

Finally, the claim for master planning services pursuant to § 3.4.5 and project management services pursuant to § 12.3.2 of Attachment B and tax management/financial planning services pursuant to § 3.4.2 of Attachment B must also be claimed as a part of plaintiff's equitable theories because fees for this work were never negotiated. Again, there is no documentary support for the work done in this area other than Mr. Rambo's belief that master planning was 45% complete and project management services were 25% complete.

## CONCLUSIONS OF LAW

### Breach of Contract

A party seeking to recovery on a contract has the burden to plead and prove the contract and its performance. Employers Mut. Casualty Co. v. United Fire & Casualty Co., 682 N.W.2d 452, 455 (Iowa Ct. App. 2004). A party breaches a contract if, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract. Id. (Citing Molo Oil Co. v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 224 (Iowa 1998)). In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach. Willie v. AG Vantage F.S., Inc., 699 N.W.2d 686 (Iowa Ct.

App. 2005); Magnusson Agency v. Public Entity Nat. Company-Midwest, 560 N.W.2d 20 (Iowa 1997).

Under Iowa law, the cardinal rule of contract interpretation is that the parties' intent controls. DeJong v. Sioux Center, Iowa, 168 F.3d 1115, 1119 (8th Cir. 1999). See also Walsh v. Nelson, 622 N.W.2d 499, 503 (Iowa 2001) ("The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract."). "The intent may be 'determined from the terms of the [contract], what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the [contract].'" DeJong, 168 F.3d at 1119 (quoting Dickson v. Hubbell Realty Co., 567 N.W.2d 427, 430 (Iowa 1997)).[2]

Contract interpretation involves two steps. First, the court must determine, from the words chosen, "what meanings are reasonably possible." Walsh, 622 N.W.2d at 503

---

[2] In their summary judgment papers, the parties disagreed whether Iowa or Nebraska law would apply to Rambo's breach of contract claim. Rambo relied on Nebraska law, due to a forum selection clause in the contract, and South Tama relied on Iowa law, citing Carson v. Nat'l Bank of Commerce Trust & Savings, 501 F.2d 1082 (8th Cir. 1974) for the proposition that federal courts are to apply the substantive law of the forum state in diversity actions. When questioned at the Final Pretrial Conference, the parties agreed that there was no dispositive difference between Iowa and Nebraska contract law. The court's review of the case law leads to that same conclusion, i.e., with respect to the legal issues of this case, Iowa law and Nebraska law are consistent. See e.g., Moller v. State Farm Mut. Auto Ins. Co., 566 N.W.2d 382 (Neb. 1997) (noting that determinations regarding ambiguities in contracts and contract interpretation are questions of law; defining a contract as ambiguous if "a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings); Gary's Implement, Inc. v. Bridgeport Tractor Parts, Inc., 702 N.W.2d 355 (Neb. 2005) (same); Wurst v. Blue River Bank of McCool Junction, 454 N.W.2d 665 (Neb. 1990) ("When construction of a contractual provision is necessary, a court may consider the conduct of the parties, performing their contract, to ascertain the parties' intent regarding their contract."); Lortscher v. Winchell, 133 N.W.2d 448 (Neb. 1965) ("The interpretation given a contract by the parties themselves while engaged in the performance of it is one of the best indications of the true intent of the contract."); Omaha Public Power Dist. v. Natkin & Co., 227 N.W.2d 865 (Neb. 1975) (same); Nowak v. Burke Energy Corp., 418 N.W. 2d 236 (Neb. 1988) (same).

(quoting Restatement (Second) of Contracts, § 202 cmt. a, at 87 (1981)).  "In do doing, the court determines whether a disputed term is ambiguous."  Id.

A contract term is "ambiguous" if, "after the application of rules of interpretation to the fact of the contract, a genuine uncertainty exists concerning which of two reasonable meanings is proper."  DeJong, 168 F.3d at 1119 (citing Service Unlimited, Inc. v. Elder, 542 N.W.2d 855, 857 (Iowa Ct. app. 1995)).  The test in determining ambiguity is objective, i.e., "whether the language is fairly susceptible to two interpretations."  Id. (citing Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991)).  "In other words, a contract term is ambiguous if, looking at the contract as a whole, it can reasonably support more than one meaning."  Id.  See also Walsh, 622 N.W.2d at 503 ("A term is ambiguous if, 'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.'") (quoting Hartig Drug Co. v. Hartig, 602 N.W.2d 794, 707 (Iowa 1999)).  A term is not ambiguous simply because the parties disagree as to its meaning.  Id.

If a term is found to be ambiguous, the court must then "choose among possible meanings."  Id. (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87). Extraneous evidence is then admissible to aid in the interpretation of the contract.  DeJong, 168 F.3d at 1121.  "If the resolution of ambiguous language involved extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact."  Walsh, 622 N.W.2d at 503 (citing Fausel v. JRJ Enters., Inc., 603 N.W.2d 612, 618 (Iowa 1999)). See also Iowa-Des Moines Nat'l Bank v. Ins. Co. of North America, 459 F.2d 650, 654 (8th Cir. 1972) ("If [the extrinsic] evidence is conflicting it should be resolved by a jury.").

"The first rule of interpretation is to examine the plain meaning of the term." DeJong, 168 F.3d at 1120.  Further, it is "well established that contracts should be interpreted as a whole, and contractual terms should be interpreted in the context in which they are used rather than in isolation."  Id.  "Another, well-established rule of contract

interpretation is that an 'interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'" Id. (quoting Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp., 266 N.W.2d 22, 26 (Iowa 1978)). "In Iowa, interpretation of contractual terms is an issue for the court unless it turns on extrinsic evidence or a choice among reasonable inferences." Id. at 1121 (citing Iowa-Illinois Gas & Elec. Co. v. Black & Veatch, 497 N.W.2d 821, 825 (Iowa 1993)).

The contract is ambiguous as to the scope of work initially authorized and how requests for additional services were to be authorized. The extraneous evidence considered in this matter shows that only the Phase One work and services was authorized by the District, and that the District would not agree to more. The District never intended to authorize work beyond Phase One except as set forth in Article XII of Attachment B, § 12.2.2, which provides that fees to be paid for assistance in passing a bond issue shall be $2,500.00. It is clear that Rambo's actions were, in this respect, done at the District's request, and were of great assistance in passing the bond issue.

The contract provides that "[f]ees for services in Phase One work shall not exceed Five Thousand Nine Hundred dollars" and that "[s]tandard reimbursable expenses, not to exceed Four Thousand dollars, shall also be paid." This money was paid to Rambo in June 1998. (Exhibit 1, Attachment A, at 2) (Exhibit J). Rambo then spent considerable time and effort to help the District get the bond issue passed. The contract provides that "[f]ees applicable to this work performed prior to funding shall be Two Thousand Five Hundred Dollars." This is the amount due Rambo under the contract.

## Unjust Enrichment and Promissory Estoppel

As an alternative to its contract claim, plaintiff seeks to recover the value of its services under the equitable claims of unjust enrichment and/or promissory estoppel. According to Rambo, it provided valuable and indispensable services to South Tama and it deserves to be paid for its work. Rambo contends that without its efforts, especially in

the areas of funding methodologies and communications campaign, South Tama would not be building a new school today. That might very well be true.

South Tama argues that judgment should enter in its favor on Rambo's unjust enrichment and promissory estoppel claims. In support of its positions, South Tama cites Iowa law holding that a plaintiff cannot recover under alternative equitable theories when the subject of plaintiff's claim is covered by an express written agreement. Because Rambo has pleaded and attempts to recover based upon the existence and breach of an express written agreement covering the same subject matter of its equitable claims, i.e., the compensation due and owing for services provided by Rambo under the agreement, Rambo may not alternatively recover based upon the equitable theories of unjust enrichment and/or promissory estoppel should its contract claim fail. South Tama further argues that the Iowa Supreme Court has held that equitable estoppel is generally unavailable against a governmental body except under exceptional circumstances, and that this principle should likewise apply to plaintiff's promissory estoppel claim. See City of Akron v. Akron-Westfield Community Sch. Dist., 659 N.W.2d 223, 226 (Iowa 2003).

Unjust enrichment is a remedy of restitution, not grounded in contract law. Iowa Waste Sys., Inc. v. Buchanan County, 617 N.W.2d 23, 29 (Iowa Ct. App. 2000). "Unjust enrichment is the modern designation for the doctrine of quasi contracts or contracts implied in law." Id. at 30. To recover on the basis of unjust enrichment, Rambo must show: (1) that it conferred a benefit upon South Tama to its own detriment; (2) South Tama had an appreciation of receiving the benefit; (3) South Tama accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value; and (4) there is no at-law remedy that can appropriately address the claim. Id. Unjust enrichment is grounded in the principle that "one shall not be permitted to unjustly enrich himself at the expense of another or to receive property or benefits without making property therefor." Guldberg v. Greenfield, 146 N.W.2d 298, 301 (1966); Giese Constr. Co. v. Randa, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994).

However, "[o]ne who pleads an express oral contract cannot ordinarily recover under an implied contract or quantum meruit. An express contract and an implied contract cannot coexist with respect to the same subject matter and the law will not imply a contract where there is an express contract." Id. (internal citations omitted). See also Chariton Feed and Grain, Inc. v. Harder, 369 N.W.2d 777, 791 (Iowa 1985) ("An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter."); Smith v. Stowell, 125 N.W.2d 795, 800 (Iowa 1964) ("One who pleads an express contract, specific to all its terms, cannot recover upon a contract implied in law."); Lautenbach v. Meredith, 35 N.W.2d 870, 871 (Iowa 1949) (noting that an express contract supersedes an implied contract relating to the same subject matter and covering all of its terms, but that there may be an implied contract on a point not covered by the express contract); Maasdam v. Maasdam's Estate, 24 N.W.2d 316, 320 (Iowa 1946)("One seeking to recover solely on an express contract specific as to all of its terms cannot recover on an implied contract, or upon a quantum meruit, or vice versa. To do so would permit a fatal variance.").

Rambo's unjust enrichment claim fails for the following reasons. First, as the court has already determined, there was an express contract provision covering the compensation Rambo was to receive for the work it performed, i.e., $2,500.00 for its assistance in passing the bond issue. Similarly, the contract language would preclude an equitable damages award for Rambo's work with respect to a possible high school classroom addition or the potential middle school as these projects from the initial study were never selected by the district or submitted to the voters for any form of funding. See Exhibit 1, at 1, ¶ 1 (providing that Rambo, at the request of the District, shall continue to provide services for facilities projects subsequently selected by the District for further development and/or funding).

Applying the elements of unjust enrichment, the court finds that Rambo did confer a benefit on South Tama to its own detriment, and that South Tama had an appreciation of receiving the benefit. At trial, South Tama's witnesses attempted to downplay the

usefulness or quality of Rambo's work, but the court is nonetheless convinced that Rambo's efforts were significant, sophisticated, and were likely a driving force behind passage of the PPEL and bond issues. However, there was a contract which provided that Rambo would be paid an additional $2,500.00 for the work it performed. Thus, inequities do not call for increased compensation where the at-law remedy of contract damages addresses this claim.

Promissory estoppel requires strict proof of its essential elements, with the burden of proof resting on the plaintiff to prove an estoppel. Schoff v. Combined Ins. Co. Of America, 604 N.W.2d 43, 50 (Iowa 1999). The elements are: (1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee would rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise. Id. at 49; Service Emp. Int'l. Local No. 55 v. Cedar Rapids Community Sch. Dist., 222 N.W.2d 403 (Iowa 1974); Amana Soc. v. Colony Inn, Inc., 315 N.W.2d 101 (Iowa, 1982); Uhl v. City of Sioux City, 490 N.W.2d 69 (Iowa Ct. App. 1992). With respect to the first element, a "promise" is a "declaration . . . to do or forbear a certain specific act. A promise is 'clear' when it is easily understood and is not ambiguous. A promise is 'definite' when the assertion is explicit and without any doubt or tentativeness." Schoff, 604 N.W.2d at 50-51 (internal citations omitted). A mere "representation," defined as "a statement . . . made to convey a particular view or impression of something with the intention of influencing opinion or action" does not constitute a "promise" and will not suffice to support recovery under a theory of promissory estoppel. Id.

As set forth above, Rambo is contractually entitled to an additional $2,500 for the work it performed. The court does not find that South Tama made any "promise" to pay anything above this amount. Rambo did the additional work based upon its past experience and the hope that ultimately it would be hired as the architect to build the school and reap its financial rewards at that stage. Both parties could and probably should have done a

better job communicating regarding the financial aspect of their relationship. However, the court does not believe that Rambo either sought or obtained a clear and definite assurance from South Tama regarding additional compensation, or that Rambo acted to its substantial detriment in reasonable reliance on any assurance. Rambo's promissory estoppel claim must fail.

Upon the foregoing,

IT IS ORDERED that the Clerk shall enter judgment in favor of the Plaintiff and against the Defendant in the amount of $2,500.00 plus costs.

February 2, 2006

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT