IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| RAMBO ASSOCIATES, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SOUTH TAMA COUNTY COMMUNITY SCHOOL DISTRICT, <br><br> Defendant. | No. 04-cv-00118 JAJ <br><br><br> **ORDER** |

## I. PROCEDURAL HISTORY

This matter comes before the court pursuant to an order remanding this case from the United States Court of Appeals for the Eighth Circuit. A bench trial was held in this matter on January 18 through 21, 2006. In a decision dated February 2, 2006, the undersigned found in favor of the plaintiff on its breach of contract claim and ordered that judgment be entered in its favor in the amount of $2,500.00. This court decided against the plaintiff on its promissory estoppel and unjust enrichment claims. Plaintiff appealed this court's decision to the Eighth Circuit Court of Appeals.

On May 31, 2007, the Eighth Circuit issued its ruling, affirming this court's judgment with respect to plaintiff's contract claim, but vacating the judgment with respect to the unjust enrichment claim and remanding for further proceedings regarding that claim. Rambo Associates, Inc. v. South Tama Comm. Sch. Dist., 487 F.3d 1178 (8th Cir. 2007). Specifically, the Eighth Circuit directed that this court determine the value of any "extra services" "beyond those associated with Phase One and with fund-raising that [plaintiff] rendered at [defendant's] request." Id. at 1189. The Eighth Circuit directed that new evidence not be taken. Finally, the Eighth Circuit noted that "[plaintiff] cannot recover for any services that it rendered as a 'public service' under Attachment A of the contract."

1

Id.

## II. THE PARTIES' ARGUMENTS

On September 7, 2007, plaintiff filed its damages brief. Plaintiff argues that it is entitled to unjust enrichment damages in the amount of at least $285,348.00, plus interest. Plaintiff contends that its recovery should be measured based upon its contribution to the overall professional services which went into the $10.5 million project ultimately constructed by defendant. Plaintiff's damage calculation is based on its trial exhibit 137. According to plaintiff, exhibit 137 does not include its work on the initial study or fund-raising efforts. Rather, it reflects the "extra services" rendered by plaintiff, i.e., educational programming and analysis, schematic design, master planning services, and project management services. Plaintiff calculated the "fair value" of this work based upon the proportion of the professional services it had completed at the time it was replaced by a different architect and construction manager. Plaintiff relies on the budget submitted to the voters, which proposed a total of $599,000 for plaintiff's "basic professional services," and a "$53,00 master planning allowance." See Plaintiff's Trial Exhibit 87.

Plaintiff breaks down the $285,348 it seeks for "extra services" as follows:

|  | PK-5 | High School Addition | Middle School Addition |
|---|---|---|---|
| Educational Programming and Analysis | $58,103 | $8,910 | $26,600 |
| Schematic Design Work | $35,940 | $4,455 | $15,540 |

Plaintiff also seeks $11,925 for "master planning," $33,875 for "owner representative/project management," and $90,000 for its "tax management/financial planning" services.

On September 24, 2007, the defendant filed its response to plaintiff's damages brief. Defendant argues that much, if not all of the work plaintiff is seeking damages for under

2

the categories of master planning, educational programming and schematic design was already performed in 1996-1999 as part of "Phase One," which has already been paid for. Defendant further argues that the majority of the services performed by plaintiff from 2002-2004 fall under the realm of "fund-raising" work, the payment of which was capped at $2,500 pursuant to section 12.2.2 of the contract. Defendant cites section 12.1 of the contract, which describes the work to be performed by plaintiff in exchange for the $2,500. Specifically, section 12.1 provides that "the Architect shall provide sketches, narratives, assistance in development of the selected Educational Program and assistance necessary for organization and communication of the Bond Issue within the District." Finally, defendant argues that much of the work performed by plaintiff (primarily by plaintiff's employee Kelli O'Brien) from 2002-2004, especially plaintiff's claimed "tax management and financial planning work" was performed as a "public service" under Attachment A to the contract. Attachment A provides "[w]hile not included in the scope of this Agreement and compensation therein, [plaintiff] may provide as a public service assistance in communicating the results of the planning work developed."

Defendant also contends that the $599,000 figure in plaintiff's proposed budget [Exhibit 137] cannot form the basis for compensation plaintiff's "extra services," noting that the decision of the Eighth Circuit Court of Appeals found that the $599,000 figure was only a proposal and never a stipulated sum upon which the parties contractually agreed. Id. at 1187. The Eighth Circuit further directed that "the $599,000 figure cannot form the basis for any compensation for [plaintiff's] services." Id. This leaves only defendant's expert as an evidentiary source and defendant argues that the reasonable compensation for plaintiff's services for all work performed from 2002 to 2004 would be $20,000. That figure would need to be reduced to account for the Eighth Circuit's requirement that bond passage/fund-raising and public service work be eliminated from any damages recovery.

The court will separately address plaintiff's claimed areas of damages.

### III. EDUCATIONAL PROGRAMMING/ANALYSIS AND SCHEMATIC DESIGN

According to the plaintiff, "[a]fter Phase 1 ended, RA completed the majority of the educational programming and analysis on the project, as shown on Plaintiff's Exhibit 88." See Plaintiff's Damages Brief, p. 5. Further, plaintiff argues that "[t]he Phase One services were not at issue in this trial, were not included in the invoice at Exhibit 137, and were not the subject of the damage evidence at trial." See Plaintiff's Reply Brief, p. 3. Such contentions are directly at odds with Mr. Rambo's trial testimony.

Regarding Exhibit 137, Mr. Rambo testified as follows:

Q. Can you tell the court what Exhibit 137 is?

A. . . . Exhibit 137 is an account summary type of statement which is a preliminary document prepared by our firm which delineates piece by piece the tasks that had been done and those for which the lump sum fees can be broken down and applied.

Q. And do you contend that these amounts are owed to Rambo Associates on account of the work that Rambo Associates did for South Tama pursuant to Exhibit 1?

A. I certainly believe they're fair values for that work to submit to this Court. . . .

The Court: And that is exactly Phase One on Attachment A to the contract, correct?

A. No. That's the response – <u>it's including items that are involved in Phase One</u>, Your Honor, <u>but it also includes some other elements that were completed or revised after that for funding</u>. <u>So in Phase One we started development of all those documents and all those services, items 1 to 7, as we talked about. This also then includes the work that was done after the study was approved, in effect, or the updating of the study was approved up through the election</u>. So as we worked with Mr. Molacek and varied the educational program and kind of tweaked it up and down to match the footages, all that's included in this number.

4

The Court:   Well – okay. Starting in Article 2 of Attachment B you've got the other phases here to which you've assigned percentages in 11.2.2 nicely set out. You've got schematic design to which you attribute 15 percent, you've got design development, you've got construction documents, bidding and negotiation, and the construction phase.

Mr. Blecha:   Uh-huh.

The Court:   And so the only other thing that is not listed under Article 2 is the programming and analysis which is the same words that you used to describe Phase One. Where do you describe the things that constitute programming and analysis that aren't included in Phase One?

A.   And, I'm sorry, I don't mean to be nitpicking this. They are exactly the same list of items that were commenced in Phase One but were adjusted after the study was done in order to match the funding. So it's all the same tasks. So we may have arrived at a building that was 105,000 square foot when the study was ended and later refined down to 97. <u>So the number you're seeing, the captured number on this summary includes all of Phase One and any adjustments thereafter to the point where we finished our work</u>.

The Court:   Okay.

A.   So its <u>everything</u>. It's back to Mr. Lippert's –

The Court:   And so here's just exactly your job here as a part of your case is persuade me why when you said "Fees for services in Phase One work shall not exceed Five Thousand Nine Hundred dollars for facilities review outlined in I. through VII. above" – why you get more money than that, and I take it that your answer to it comes from the paragraph below where you just call that amount a retainer.

A.   Absolutely.[1]

Tr. 490:7 - 495:1 (emphasis added).

---

[1] Plaintiff's "retainer" argument was rejected both by this court and by the Eighth Circuit. <u>Rambo Assoc.</u>, 487 F.3d at 1188.

5

With respect to the high school classroom addition proposal, Mr. Rambo testified:

> A. In the budget data we looked at earlier, one of the columns addresses the high school; same categories we spoke of earlier. The total projected fee for that addition was $99,000 which is actually very low for that, but we assumed it would be done in conjunction with the other project. It was developed at the same time so it would have a lower fee, so if one looked at the scheduled fees for an addition and everything, it would be less. This is less than what the schedule fee was.
>
> Q. And the first item of damage with respect to that classroom addition was education programming and analysis, correct?
>
> A. Yes, and that's the 9-12 program that's involved here. That's a product of discussing with Mr. Molacek, if my memory serves me correctly, that there would be seven general purpose classrooms of varying size needs, two special programs rooms, and a specific location was made for that, a site plan and so forth that's shown over there.
>
> Q. Is all that work beyond what you did with respect to the initial study?
>
> A. <u>The initial study commenced it, and just as I answered to His Honor earlier, whatever else was done on it afterwards, which was minimal, is reflected in this.</u> So there's no other exposure to this in the simplicity of the agreement listing it all out to begin with.

Tr. 502:7 - 503:7.

With respect to the "Educational Programming and Analysis" fees sought by plaintiff, as set forth in Exhibit 137, Mr. Dikis testified (on cross-examination):

> Q. As I understand Mr. Rambo's account summary data, he is asserting on the PK-5 project that he was 97 percent completed with the educational programming and analysis for a PK-5 project; do you see that?
>
> A. Yes.
>
> Q. Do you have any reason to doubt that?
>
> A. I was surprised by it, and the reason I'm surprised by it is that my

6

impression was that the educational programming was taking place during the first phase of the work during 1996 to '98 so that I would not have expected there to any or very little – understand the concept was changed from PK-3 to PK-5 so that there might have been a very small amount of effort to adjust the work done in the first phase.

Q. But are you surprised that with respect to that PK-5 project, that almost all of the educational programming and analysis was done?

A. No, I would have thought it would have been done from 1996 to '98.

Q. Okay. And I'm not sure there's a difference here. I think this is a summary of all the work, but be that as it may, with respect to schematic design, based on the record that you have had the opportunity to review, would you think it appropriate for Mr. Rambo to have concluded that he was 40 percent completed with the schematic design?

A. My impression is that's somewhat optimistic, although my opinion is a difficult one because there's not a real common definition of schematic design.

. . .

Q. Okay. With respect to the high school classroom addition, based on the documents that you had the opportunity to review, did it appear to you that Mr. Rambo was, in fact, 90 percent completed with the educational programming and analysis for that high school classroom addition?

A. If I may – if I can in my answer include the work he did during 1966 to 1998?

Q. '96 you mean?

A. Yes. 1996 to 1998, yes.

Q. Yes. And so based on all that work both in the '90s and in the early 2000s, you would agree that he was 90 percent complete with that.

A. Yes.

7

Tr. 973:4-978:12.

>    Q. And do you have any reason to think that Exhibit 137 covers only the 2002-2004 time period?
>
>    A. Well, that was my impression when I reviewed them because the term – there are termination expenses included, and that – the only place those could have come from was the unexecuted AIA contract.
>
>    Q. That's right, but there's nothing in the document that says it does not include work that the Rambo firm did in '96 to '99 for which it was unpaid; is that –
>
>    A. No, I'm not aware of that.

Tr. 1004:17-1005:2.

From this evidence, it is clear that the damages sought by plaintiff in reliance on Exhibit 137 for educational programming/analysis and schematic design includes work done from 1996 to 1998, i.e., Phase One, for which fees were capped at $5,900.00 under the contract, and which has already been paid. The court has scoured the record for objective evidence that would sustain an award for damages for "extra" work done in these areas from 2002 to 2004 and has found none. Despite the finding of this court that damages for Phase One work were capped at $5,900, which was affirmed by the Eighth Circuit, the plaintiff continues to rely on Exhibit 137 in seeking damages for all of the work it did on the defendant's school project. Even Mr. Dikis' estimate that plaintiff would have spent an additional 200 to 300 hours of work on defendant's project from 2002 to 2004 does not account for the work of plaintiff attributable to fund-raising or public service, for which it may not be further compensated.

Plaintiff maintained no time records of its work on defendant's project. While understandable, given the nature of plaintiff's business operations, it nevertheless remained plaintiff's burden to demonstrate value of its "extra services" beyond Phase One work,

8

beyond fund-raising efforts, and in addition to those offered as a public service under the contract. Plaintiff has failed to meet its burden. Based upon the record at trial, it would be pure speculation for the court to determine the value of the "extra services" rendered by plaintiff. See Quade v. Heiderscheit, 391 N.W.2d 261, 264 (Iowa Ct. App. 1986) ("To recover damages, a party must prove damages were sustained and such damages cannot be speculative but must have a reasonable basis supported by the evidence.") (citations omitted); Olson v. Nieman's Ltd., 579 N.W.2d 299, 309 (Iowa 1998) (noting that while "some speculation is acceptable . . . overly speculative damages cannot be recovered"); Jamison v. Knosby, 423 N.W.2d 2, 6 (Iowa 1988) ("Under general damage principles, overly speculative damages cannot be recovered."). Given the lack of sufficient evidentiary support, the court declines to award unjust enrichment damages for plaintiff's educational programming/analysis and schematic design work.

### IV. **MASTER PLANNING SERVICES**

Plaintiff seeks $11,925 in "Master Planning Services," which it derives from its contention that it was 45% complete with the pre-design phase, which had a budgeted amount of $26,500 allocated. See Plaintiff's Trial Exhibit 137.

With respect to "Master Planning Services" Mr. Rambo testified:

Q.  Okay. Now if you'll turn to page 2 of Exhibit 137.

A.  Yes.

Q.  This is entitled "Master Planning Services."

A.  Yes.

Q.  And can you tell us what that refers to.

A.  In the budget that was utilized for the project – and actually for the 1999 project a similar number was approved, but at any rate, in the figures for the

9

> 2003 and '4 work, $53,000 was included in that budget for master planning of future additions of which we only did a fraction of the work.

Tr. 506:4-16 (emphasis added).

Notwithstanding the claims made in plaintiff's damage briefs, Mr. Rambo admitted that the figures included in Exhibit 137, included both work the plaintiff did from 1996 to 1998 and from 2002 to 2004. Mr. Rambo further admitted, as set forth above, that the plaintiff "only did a fraction of the work" in 2003 and 2004. Unfortunately for the plaintiff, he did not identify what fraction of the 45% it completed in 2003 to 2004, at the request of the defendant. The court's own review of the record found no additional evidence supporting a sufficiently non-speculative award of unjust enrichment damages for plaintiff's "Master Planning" work. Again, the court finds that the plaintiff did not meet its burden in establishing its damages in this regard. As such, recovery must be denied.

### V. OWNER REPRESENTATIVE/PROJECT MANAGEMENT

Regarding "Owner Representative/Project Management" Mr. Rambo testified:

Q. And then the next item of damages you contend are owed are owner representative project management service.

A. Yes.

Q. Is that also set forth in Exhibit 1 and its attachments?

A. Yes. In Article 12.3.2 it indicates that our firm would serve as a project manager which the District would utilize instead of a construction manager, again, going back to the difference in the bidding systems, and it sets forth that each of the budget areas under Article 12.3.2 would include a factor of 3-1/2 percent for preliminary planning purposes to be set aside for project management services.

Q. All right.

A. And those services in the early stages of a project address market analysis

10

and detailed construction analysis that might be done on alternatives such as the question of the alternative design of a sloped roof versus a standard roof, a metal building versus a normal building, composition, precast concrete structure versus a standard barren masonry construction. <u>So that whole set of studies that we've reviewed earlier as well as the market analysis of the bidders in the area of South Tama and so forth that were done during – entirely during the 2003-'4 period, that's what's reflected there.</u>

Q. In the owner representative.

A. Yes.

Tr. 508:12 - 509:14 (emphasis added).

The plaintiff's continued reliance on Exhibit 137, which clearly encompassed work done by the plaintiff both from 1996 to 1998 and from 2002 to 2004, absent further clarification, does not sustain the plaintiff's burden of proving its damages for the "extra work" it provided. The court's review of the record revealed no basis upon which to discern precisely what "Owner Representative/Project Management" work was done by Plaintiff outside of Phase One. No recovery shall be had.

## VI. TAX MANAGEMENT/FINANCIAL PLANNING

In its damages brief, plaintiff claims that $90,000 is fair and reasonable compensation for the "Tax Management/Financial Planning" services it provided to the defendant.

Regarding "Tax Management/Financial Planning" Services, Mr. Rambo testified that a figure was not included in Exhibit 137 because:

> At this point in July [2004] when we're trying to create a quick summary of what has accrued in the project, we're recognizing that the financial planning services under Article 3.4 – 3.4.3 are not included in basic services. We are not assessing an amount for that, but we certainly know that a major commitment was made in that area and a significant amount of

11

time invested in that."

Tr. 510:12-18.

Mr. Rambo testified further:

Q. Do you have an estimate, is there any way you can estimate the value of the tax management or financial planning service you provided to the South Tama School District at their request?

A. I believe the question was is there a way to value that service, and I understand the communication that's gone on. We don't know a specific number of hours. I have no interest in answering that question that way, anyway, however, for arranging financing in a commercial project, it's very rare for anything less than half a point or half a percentage point to be charged in any fact of industry or development. More common is three-quarters to 1 percent which would be the equivalent of a loan negotiation fee.

. . .

A. And I'm not making that claim. All I'm saying is – I think you've asked me to put a benchmark on it.

Q. Yes.

A. For everything that's been talked about for the last day and a half, the financing is the key that the District was not capable of putting together on their own, didn't come from anybody else. We promoted it in the community, we gained an understanding of it; there is some value to it. I would leave it to the Court to decide what that is, because, again, we never kept track of hours of anything, and even if we did, you know, Edison had that hour he figured the light bulb out in that was worth more than the year before.

Q. I understand.

A. <u>And I don't know what its value is</u>, Your Honor.

Q. <u>But the benchmarks you've given to the Court are somewhere between one-half percent and 1 percent of the nine million dollars</u>.

>     A.  <u>In other industries, yes, or other projects</u>.
>
>     Q.  <u>Similar projects</u>.
>
>     A.  <u>Certainly of that scope, sure</u>.

Tr. 511:10-13; 513:4-13 (emphasis added).

The court does not find Mr. Rambo's testimony convincing. After admitting that he did not know the value of the financial planning services the plaintiff provided to the defendant, Mr. Rambo offers one percent of the amount funded, i.e., one percent of $9 million dollars, or $90,000 as a benchmark, citing to projects of similar scope, albeit in different industries. Mr. Rambo admitted that an acceptable percentage may be as low as one-half of one percent, which obviously would decrease the amount sought by half. The court further rejects plaintiff's argument that Mr. Dikis' testimony that his firm charged in the neighborhood of $175,000 to $225,000 for a financial feasibility study for the Iowa crime lab supports its request of $90,000 for its tax management/financial planning services. Mr. Dikis testified that his firm's analysis was very complicated due to the nature of the building. Mr. Dikis further testified that his firm does not do tax management analysis for schools. Tr. 992:4 - 993:3. The court is not convinced, based upon the evidence (or lack thereof) provided by the plaintiff, that $90,000 would be a reasonable award for its "Tax Management/Financial Planning" work. Thus, court declines to award unjust enrichment damages for this work.

## VII. **CONCLUSION**

The court has reviewed the trial record in its entirety finds that it is insufficient to determine the value of plaintiff's services to the defendant beyond those associated either with Phase One, with plaintiff's fund-raising efforts, or those rendered as a "public service" under Attachment A of the contract.

Upon the foregoing,

**IT IS ORDERED** that, pursuant to the ruling of the Eighth Circuit Court of Appeals remanding this matter for further findings, the court supplements its decision of February 2, 2006 as set forth above. The court declines to award damages based upon the plaintiff's unjust enrichment theory.

**DATED** this 6th day of November, 2007.

_____
JOHN A. JARVEY
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF IOWA